McBEAN, Plaintiff in error, vs. THE STATE, Defendant in error.

*September 7 — October 25, 1892.*

CRIMINAL LAW AND PRACTICE. (*1*) *Instructions to jury: Misapprehension of evidence.* (*2, 3*) *Promise of clemency made to jury: Evidence.*

1. On a trial for an assault with intent to kill, defendant claimed that he shot the complaining witness in self-defense. Said witness testified that his revolver was discharged in a scuffle before the defendant shot him, but the court instructed the jury that the evidence of the state was to the effect that the revolver was not discharged until after defendant had shot him. *Held,* error.

2. The judgment on a verdict of guilty will be reversed where such verdict was only agreed upon after the jury had asked for and received an assurance from the trial judge that they could depend upon the clemency of the court to the defendant.

3. Affidavits of the jurors are admissible to show that they received such an assurance. *Edmister v. Garrison,* 18 Wis. 594, distinguished.

ERROR to the Circuit Court for *Oneida* County.

On November 16, 1890, the plaintiff in error, *McBean,* was temporarily in charge of a saloon in the county of Oneida. On that night one Felix Taylor and his wife, Mollie, and his brother, Alexander, were stopping at said house, and were considerably under the influence of liquor. While there the said Mollie got into a controversy with some fellow because he had refused to dance with her. Felix interfered, and *McBean* came from behind the bar for the purpose of stopping them. Alexander then struck *McBean,* and knocked him down. Thereupon *McBean* went behind the bar, and got a double-barreled shotgun, and discharged the contents of one barrel into the floor of the barroom, for the purpose of intimidating the Taylors and quelling the row. *McBean* thereupon reloaded the barrel so discharged. Felix and *McBean* then quarreled, and

*McBean* then went into the kitchen, and Felix went up-stairs to his wife's room, opened her trunk, and got his revolver from it, and loaded the same, and started to come downstairs. He met his wife at the head of the stairs, and she, seeing the revolver in his hand, implored him not to go downstairs, saying there would be trouble if he did, and tried to take the revolver from him. He told her he could shoot as well as anybody. In her struggle for the revolver it was discharged at the head of the stairs. About that time one Annie Hickey went downstairs to the kitchen; and told *McBean* to look out for Felix, that he had a gun. After the revolver discharged upstairs, Felix broke away from his wife and went downstairs. Soon after, his revolver was discharged. Thereupon *McBean* shot Felix once or twice.

*McBean* was charged with an assault upon the said Felix with intent him, the said Felix, to feloniously kill and murder. He pleaded not guilty, but was convicted and sentenced to the state prison for the term of three years.

For the plaintiff in error there was a brief by *Alban & Barnes*, and oral argument by *John Barnes*.

For the defendant in error the cause was submitted on the brief of the *Attorney General* and *J. M. Clancey*, Assistant Attorney General.

CASSODAY, J. This judgment must be reversed for manifest error upon the trial. The theory of the defense is that *McBean* shot Felix in self-defense. It is undisputed that, after the row in the barroom, *McBean* went into the kitchen and closed the door; that while there he was informed that Felix was coming downstairs with a gun or revolver; that about the same time he heard Felix's revolver discharged upstairs; that very soon thereafter Felix and his brother, Alexander, came downstairs, when Felix's revolver was again discharged. It was a very important question, upon

the subject of such self-defense, whether Felix's revolver was so discharged before or after he was shot by *McBean.* . Upon that question the court, among other things, charged the jury: "You must remember that the testimony of the state tends to show that the said Felix Taylor *did not fire* or discharge his revolver *before* the defendant had shot at him after returning downstairs. There is no question but what the revolver was discharged upstairs in this house, *but the · evidence of the state is to the effect* that his revolver was not discharged *but once,* or, at least, *after he returned* upstairs, *until· after the defendant had shot at him* with his gun." Felix was the complaining witness, and, among other things, testified as follows: "I got shot as I came downstairs. When I got shot I was at the front door in the hall. . . . I . . went downstairs,— clear down. I went out into the hall. Was near the middle of the hall when I got shot. The hall is three feet wide. . . . The way it was, my brother followed me down and grabbed the revolver, and took it away, and it went off in some way. I don't remember whether in my hands or his. *Was shot before I moved, after my revolver went off.* I think my brother took the revolver from me *after* the shot was fired. Do not remember whether it was *after* or before. The second shot from the revolver went off at the foot of the stairs, and my brother was trying to take the revolver away from me at the time. The shot from the revolver went off *after* I went out into the hall. The scuffle for the revolver was *before I was shot,* and the revolver *went off in the scuffle.*" It is very evident that the learned trial judge misapprehended the effect of the evidence on the part of the state, at least so far as the testimony of the complaining witness is concerned.

It further appears from the record, certified by the trial judge, that after the jury in the cause had been out deliberating upon their verdict for several hours, and finding

themselves equally divided upon the question whether *Mc-Bean* was guilty of the crime charged, they, through their foreman and the officer in charge, sent to the trial judge a communication to the effect: "If we bring in a verdict of guilty, can we depend on the clemency of the court?" to which the trial judge sent to them an answer to the effect that they could, or "Yes." Thereupon the jury returned the following verdict and recommendation, after the title of the cause, to wit: "We, the jury, find the defendant guilty in manner and form as charged. CHAS. E. WOODWARD, Foreman. We, the jury in the above cause, recommend the defendant to the clemency of the court. CHAS. E. WOODWARD, Foreman."

Had the learned trial judge, during the delivery of his charge or at its conclusion, and in open court, given such an answer to such a question put by a juryman, no one, we apprehend, would have contended that it was not error. No attempt has here been made to justify such an answer to such a question. It is said, in effect, that such communications are not made to appear by competent evidence, since no affidavit of the person in charge of the jury was presented. But the judge who certified to the record necessarily knew whether he had received any such communication from the jury, and also whether he answered it in the way stated; and the affidavits of the jurymen show that they received such answer.

It is contended that such affidavits of jurymen were inadmissible in evidence under the ruling of this court in *Edmister v. Garrison*, 18 Wis. 594. It was there held that the affidavits of jurors to *their own misconduct* cannot be received to impeach their verdict. Such is, undoubtedly, the general rule. But to arbitrarily exclude all such affidavits, whenever they directly or indirectly affect the verdict, would be a gross wrong to jurymen as well as parties, and would frequently defeat the ends of justice. Thus,

McBean vs. The State.

affidavits of jurors have been held admissible to prove a mistake or error of the foreman in announcing the verdict. *Cogan v. Ebden,* 1 Burrow, 383; *Dalrymple v. Williams,* 63 N. Y. 361, 20 Am. Rep. 544. So they have been held admissible to prove a mistake made by the clerk in entering, or the court in directing, a verdict different from that found. *Jackson v. Dickenson,* 15 Johns. 309, 8 Am. Dec. 236. So they have been held admissible to prove a mistake in returning a verdict for the wrong party, or for a larger or smaller sum than intended. *Little v. Larrabee,* 2 Me. 37, 11 Am. Dec. 43. So they have been held admissible to prove that the verdict was for one twelfth of the aggregate amount of the several sums which each juryman determined to be the true amount. *Elledge v. Todd,* 1 Humph. 43, 34 Am. Dec. 616. So they have been held admissible to prove the misconduct of a party or the officer having them in charge. *Thomas v. Chapman,* 45 Barb. 98. So they have been held admissible to prove that some of the jury were not satisfied of the prisoner's guilt, and assented to the verdict only because they believed that the recommendation to mercy which they made at the time of returning their verdict would be effectual. *Crawford v. State,* 2 Yerg. 60, 24 Am. Dec. 467, and cases cited in the note. In this last case the judgment was reversed because it appeared from such affidavits that the honest conclusions of some of the jury had been overcome by such extraneous considerations; and hence the decision goes much further than we are here asked to go. The belief of the jurymen in that case, that their recommendation to mercy would be effectual, was there likened unto a contract procured from an individual by mistake and misrepresentation; and yet it does not appear that the trial judge in that case made any pledge of mercy, as here.

The question put by the jury to the trial judge in the case at bar was, in and of itself, harmless. The error con-

sists of the promise made by the trial judge to the jury, to the effect that, if they found *McBean* guilty, they might rely upon him to extend the clemency of the court to the prisoner. It sufficiently appears from the verdict returned that the jury did rely upon such promise. The promise thus secured was well calculated to overcome reasonable doubts, and coerce an agreement for conviction. It was an unauthorized interference with the deliberations of the jury. *Ryan v. Rockford Ins. Co.* 77 Wis. 611. "A verdict is a declaration of the *truth as to the matters of fact* submitted to the jury." *Shenners v. West Side St. R. Co.* 78 Wis. 387. To be such truth, however, it must be based wholly upon the evidence in the case. A verdict in disregard of such evidence, in whole or in part, is a false verdict. It follows that any promise, pledge, or declaration of the trial judge, calculated to draw the attention of the jury away from the evidence, and to induce them to base their verdict upon ulterior considerations, is necessarily misleading and hence erroneous.

There may be other errors in the record, but, if so, they are not likely to be repeated, and need not, therefore, be here considered.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial. The warden of the state prison will surrender the plaintiff in error to the sheriff of Oneida county, who will hold him in custody until he shall be discharged or his custody changed by due course of law.